UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC BROWN, et al.,

       Plaintiffs,

                                          Case No. 1:21-cv-855

v.

                                          Hon. Hala Y. Jarbou

CITY OF WYOMING, et al.,

       Defendants.

_____/

## OPINION

Plaintiffs Eric Brown, Roy Thorne, and S.T. Thorne bring this civil rights action asserting claims under 42 U.S.C. § 1983.  Plaintiffs allege that Defendants Logan Wieber, Russel Kamstra, Devin Quintard, Arrow Kotarak, Zachery Jackson and Brian Look ("the individual officers") violated their Fourth Amendment rights to be free from unreasonable search and seizure and excessive force as well as their Fourteenth Amendment rights under the Equal Protection Clause. Plaintiffs are suing the individual officers in both their individual and official capacities.  Plaintiffs further allege state law violations of assault, battery, and false imprisonment against the individual officers.  Plaintiffs also bring a municipal liability claim against Defendant City of Wyoming and a supervisory liability claim against Defendant Kimberly Koster, chief of police.  Finally, Plaintiffs bring a state law claim of intentional infliction of emotional distress against all Defendants.  Before the Court is a motion for partial dismissal on behalf of all Defendants (ECF No. 25).  Also before the Court is Defendant City of Wyoming's motion for summary judgment or, in the alternative, for judgment on the pleadings (ECF No. 39) and Defendants Wieber, Kamstra, Quintard, Kotarak, Jackson, Look, and Koster's motion for summary judgment or, in the alternative, for judgment on the pleadings (ECF No. 41).

## I. FACTUAL BACKGROUND

The incident in this case took place at 2417 Sharon Avenue Southwest in the City of Wyoming. (Google Maps Images, ECF No. 40-2.) At the time of the incident in the summer of 2021, this two-story home was vacant and in the process of being sold. (Brown Dep. 66, 84, 107-08, ECF No. 40-3.)

On July 24, 2021, Officers Wieber and Chapman responded to a call regarding a suspected trespassing at the Sharon Avenue home. (Wieber Dep. 8-9, ECF No. 40-5; 7/24/2021 Dispatch Call, ECF No. 40-6.) The caller was the owner of the home at the time. (Wieber Dep. 10-11.) When Wieber arrived, he saw a black Mercedes sedan parked in the driveway and the homeowner standing next to his truck which was parked on the street. (*Id.* at 10.) The black Mercedes had been seen coming and going from the home. (*Id.* at 11.) Wieber was waiting for Chapman to arrive when the suspect, an African-American male, exited the home and sat down on the porch. (*Id.*) Wieber ordered the suspect to stand up and walk towards him. (*Id.* at 13.) Wieber handcuffed the suspect and then conducted the rest of his investigation which included speaking with the suspect, the homeowner, and the listing agent of the home. (*Id.* at 14.) The suspect explained that he was looking at the home. (*Id.* at 15.) However, after contacting the listing agent, Wieber determined that the suspect entered through an unlocked door that was not supposed to be unlocked at the time. (*Id.*) The suspect was arrested for misdemeanor unlawful entry. (*Id.* at 16-17.) Chapman arrived on the scene after the suspect had already been detained. (*Id.* at 15.)

On August 1, 2021, another individual called dispatch to report that a "young black man" who had previously been arrested at the Sharon Avenue home is "back there again." (8/1/2021 Dispatch Call 00:17-00:32, ECF No. 40-8.) The caller stated that the suspect had parked his black sedan in the driveway, walked around the car, and then sat back inside the car. (*Id.* at 1:35-1:51.) Having responded to a similar incident at the Sharon Avenue home days earlier, Wieber called the

individual directly to gather more information.  (Wieber Dep. 25-26.)  Due to the similarities to the July 24, 2021, incident, Wieber escalated the call from trespassing to breaking and entering.  (Wieber Dep. 46.)  This escalated status increased the number of officers responding to the call.  (Look Dep. 16, ECF No. 40-9.)

Thorne, who has primary custody over his biological children, including S.T., was looking to purchase a home "in the Kentwood/Wyoming area for school purposes."  (Thorne Dep. 7, 9, ECF No. 45-3.)  Thorne contacted Brown, a real estate agent and friend, for help with his search.  (*Id.* at 9.)  Brown and Thorne planned to meet at the Sharon Avenue home between 12:00 p.m. and 2:00 p.m. on August 1, 2021.  (Brown Dep. 66, ECF No. 45-4.)  Brown arrived at the home approximately 10 to 15 minutes before Thorne and S.T. and parked his black Genesis in front of the house.  (*Id.* at 71-72.)  Brown opened the doors and turned on the lights before walking back outside and introducing himself as a realtor to a neighbor who had been outside.  (*Id.* at 73-74.)  Thorne and S.T. arrived at the house in a dark charcoal gray Chevy Malibu and then entered the home with Brown.  (Thorne Dep. 30-32.)

Shortly thereafter, Officer Quintard arrived at the home.  He called dispatch with the license plate numbers of Brown and Thorne's vehicles, dispatch began the plate check, and Quintard exited his vehicle once Wieber arrived moments later.  (Quintard Dep. 22-23, ECF No. 45-5.)  Quintard noticed movement inside the home and "could only make out that it was a white T-shirt."  (*Id.* at 25.)  He then approached the southeast corner and continued past it to the rear of the home with his firearm drawn to begin establishing a perimeter.  (*Id.* at 26-27; Quintard Body Camera 2:08-2:34, ECF No. 40-15.)  Once Officer Kotarak arrived on the scene, he positioned himself near the tree on the southeast corner.  Kotarak testified that he had his gun drawn but at his side.  (Kotarak Dep. 34-35, ECF No. 40-21.)

Wieber opened his car door and took cover before giving verbal instructions to the suspects in the home.  (Wieber Dep. 32-33, 35.)  He gave instructions to come outside with hands in the air or hands raised.  (*Id.* at 34.)  At this time, Wieber had his firearm drawn at his side but not pointed directly at the home or suspects.  (*Id.* at 36.)

Inside the home, S.T. came upstairs to tell Thorne and Brown that the police were outside. (Thorne Dep. 35.)  Thorne replied by saying "they're not here for us."  (*Id.* at 35-36.)  After S.T. said there were a lot of them, Thorne looked out the window and saw two officers with their guns drawn.  (*Id.* at 36-38.)  Thorne opened the window and yelled "Officer!" repeatedly.  (*Id.* at 38.) Thorne testified that Kotarak pointed his gun towards the window at this time.   (Thorne Dep. 38-41.)  Thorne, S.T., and Brown then ducked under the window on the floor before Thorne yelled that the three of them were coming out.  (*Id.* 38-39.)

Thorne, S.T., and Brown came out of the home one at a time with their hands in the air and were handcuffed by the officers.  (Jackson Dep. 36, ECF No. 45-6; Wieber Dash Camera 3:27-6:22, ECF No. 40-11)  During this time, Jackson had his firearm pointed towards the front door. (*Id.* at 38.)  Kamstra handcuffed Brown first. Wieber then re-holstered his firearm, handcuffed Thorne, and placed him in the backseat of a patrol car.  (Wieber Dep. 43; Thorne Dep. 67.)  While Thorne was in the backseat, he explained that Brown was both his friend and a licensed realtor who was showing him the home.  (Jackson Body Camera 4:20-4:29, ECF No. 40-17.)  Finally, Jackson handcuffed S.T. and also placed him in the backseat of a patrol car.  (Jackson Dep. 38-39, ECF No. 40-10; Jackson Body Camera 5:11-6:52.)

After being handcuffed by Kamstra, Brown identified himself as a realtor and offered his wallet to verify his identity which Kamstra reviewed.  (Brown Dep. 105; Kamstra Body Camera 3:45-4:12, ECF No. 40-12.)  Brown further offered his cellphone to verify his appointment to show

the house and the application he used to access the key box and gain entry.  (Brown Dep. 105; Kamstra Body Camera 4:15-5:10.)  Kotarak assisted Kamstra in verifying Brown's identity. (Kotarak Body Camera 1:06-1:25, ECF No. 40-16.)  Brown was subsequently unhandcuffed and released.  (Brown Dep. 123; Kamstra Body Camera 5:20.)  Kamstra apologized for the inconvenience, and Brown responded "you gotta do what you gotta do."  (Kamstra Body Camera 5:30-5:33.)  Sergeant Look arrived on the scene as Kamstra was unhandcuffing Brown.  (Look Dep. 32-33.)  After Brown verified his identity and was released, both Thorne and S.T. were also unhandcuffed.  (Wieber Dash Camera 8:51-9:00; Jackson Body Camera 6:59-7:25.)

## II. STANDARD

### A. Failure to State a Claim

Dismissal on a motion under Rule 12(b)(6) is appropriate when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A claim may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  To determine whether a pleading fails to state a claim, courts must ask whether the plaintiff has alleged "facts that, if accepted as true, are sufficient 'to raise a right to relief above the speculative level,' and . . . 'state a claim to relief that is plausible on its face.'"  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp.*, 550 U.S. at 555, 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausible does not mean probable, but the standard "asks for more than a sheer possibility that a defendant has acted unlawfully . . . . Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 557.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56.  *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).  "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment."  *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citing *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015); *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).

### B. Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Courts apply the same standard of review when analyzing a motion for judgment on the pleadings are they do when deciding a motion to dismiss for failure to state a claim.  *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008).  When deciding a Rule 12(c) motion brought by a defendant, a court must accept all the complaint's well-pleaded factual allegations as true, draw all reasonable inferences in favor of the plaintiff, and view the complaint in the light most favorable to the plaintiff.  *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007).  The motion may be granted only if the defendant is nevertheless entitled to judgment.  *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

### C. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

### A. Individual Liability

Plaintiffs bring false arrest, excessive force, and equal protection claims against Wieber, Kamstra, Quintard, Kotarak, Jackson, and Look. The individual officers argue they are entitled to summary judgment on the basis of qualified immunity.

"Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights.'" *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)). Officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "To be clearly established, a legal principle must have a sufficiently clear foundation in

then-existing precedent." *Id.*  This legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590.  Accordingly, "[t]he relevant, dispositive inquiry" under the clearly established prong is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"[C]ourts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  The plaintiff bears the burden of showing that an officer is not entitled to qualified immunity.  *See LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016).  "When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately.  [And] the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).

### 1. Clearly Established

According to Plaintiffs, "there was ample binding authority in place before these events transpired that clearly established that Plaintiffs each had a right to be free from detention without probable cause, to be free from threats of lethal force where there was no justification for any force under these circumstances and to be free from being targeted in a criminal investigation merely because of their race."  (Pls.' Br. in Opp'n to Individual Defs.' Mot. for Summ. J., ECF No. 46, PageID.1192.)

Plaintiffs, however, define their clearly established rights at the highest level of generality. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).  Specificity is required in the Fourth Amendment context because

> [p]robable cause turn[s] on the assessment of probabilities in particular factual contexts and cannot be reduced to a neat set of legal rules.  It is incapable of precise definition or quantification into percentages.  Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered.  Thus, we have stressed the  need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.

*Id.* (internal citations and quotation marks omitted).  The Supreme Court has similarly cautioned that "specific cases are 'especially important'" when it comes to excessive force.  *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022) (quoting *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11-12 (2021) (per curiam); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018) (per curiam)).

And despite Plaintiff's allegation that there is ample binding authority that supports their clearly established rights, Plaintiffs have not "point[ed] to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered."  *Bell*, 37 F.4th at 367 (citing *Cunningham v. Shelby Cnty.*, 994 F.3d 761, 765 (6th Cir. 2021)).  Plaintiffs' reliance on precedent to establish the general principle that individuals have a right to be free from detainment without probable cause, excessive force, and investigation on the basis of race does not clearly establish their rights in this particular context.

Finally, this is not a rare and obvious case where the unlawfulness of the individual Defendants' conduct is sufficiently clear.  *See Wesby*, 138 S. Ct. at 590.  "[W]hen the conduct of a government official is so egregious that a constitutional violation is apparent, the Supreme Court

does not require that a case be 'directly on point' to satisfy the 'clearly established' prong of the qualified-immunity analysis." *Burnett v. Griffith*, 33 F.4th 907, 914 (6th Cir. 2022) (quoting *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 660 (6th Cir. 2021)).  As further explained below, the individual Defendants actions were not so egregious that a constitutional violation is apparent. Plaintiffs have not met their burden of showing their rights were clearly established.

### 2. Constitutional Violation

Even if Plaintiffs' rights were clearly established, the individual officers are still entitled to qualified immunity because there was no constitutional violation.

#### (a) Unlawful Detention

"[A]n investigatory detention is a seizure that is subject to Fourth Amendment scrutiny." *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001).

> When the nature of a seizure exceeds the bounds of a permissive investigatory stop, the detention may become an arrest that must be supported by probable cause.  Yet, there is no litmus test for determining when the line is crossed.  We consider such factors as the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigatory stop is reasonably related to the basis for the original intrusion.

*Dorsey v. Barber*, 517 F.3d 389, 398-99 (6th Cir. 2008) (internal citations omitted).  "[T]he fact that [Defendants] did not formally arrest [Plaintiffs] does not resolve the issue of whether their detention amounted to an arrest requiring probable cause." *Gardenhire v. Schubert*, 205 F.3d 303, 314 (6th Cir. 2000).  "'[T]he use of guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest, [but] these displays of force must be warranted by the circumstances.'  Intrusive measures are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers." *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015) (quoting *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006)); *see also Alexander v. Carter for Byrd*, 733 F. App'x 256, 267 (6th Cir. 2018) (noting

10

that the Sixth Circuit has held that "when a suspect is placed in the back of a police car, the suspect is considered to be under arrest." (citing *United States v. Shaw*, 464 F.3d 615, 622 (6th Cir. 2006)). Here, Plaintiffs' seizure crossed the line from an investigatory detention to an arrest that required probable cause because, upon their handcuffing and detention, Plaintiffs were neither a flight risk nor a threat.[1]

"'A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.'" *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)).

> Therefore, a showing of probable cause provides a complete defense to a claim of false arrest. An officer is entitled to qualified immunity if he reasonably believed that the arrest was lawful, even if that belief was erroneous. State law defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest.

*Woods v. Eubanks*, 25 F.4th 414, 421 (6th Cir. 2022) (internal citations and quotation marks omitted).

"An officer has probable cause to arrest a suspect when the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "An objective, not a subjective, standard applies. The question is whether the observable circumstances justify an arrest; the officer's 'subjective reason for making the arrest need not be the criminal offense as to which the

---

[1] Plaintiffs and Defendants also analyze this claim under the probable cause standard required for a false arrest. (*See* Individual Defs.' Br. in Supp. of Mot. for Summ. J., ECF No. 42, PageID.716; Pls.' Br. in Opp'n to Individual Defs.' Mot. for Summ. J., PageID.1192-1193.)

known facts provide probable cause.'"  *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

A probable cause determination "must [also] take account of 'both the inculpatory *and* exculpatory evidence.'"  *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (quoting *Gardenhire*, 205 F.3d at 318 (emphasis in original)).  "Although precedent does not mandate that law enforcement operatives should conduct quasi-trials as a necessary predicate to arrest, an officer cannot simply turn a blind eye toward evidence favorable to the accused or ignore information which becomes available in the course of routine investigations.  *Id.* (internal citations and quotation marks omitted).

Dispatch initially labeled the August 1 call as a trespass but subsequently escalated it to a breaking and entering of an unoccupied dwelling.  (Look. Dep. 14.)  Neither party provides the Court with the precise Michigan statute that Plaintiffs were suspected of violating.  Generally, under Michigan law, a person is guilty of breaking and entering when he or she breaks and enters a building or dwelling with intent to commit a felony, larceny, or a misdemeanor.  *See* Mich. Comp. Laws §§ 750.110; 750.110a.

<u>Officer Wieber</u>

Wieber had probable cause to believe Plaintiffs were breaking and entering into the Sharon Avenue home.  First, Wieber had information from an eyewitness.  "[R]eliance on the account of an eyewitness is sufficient to establish probable cause."  *Crockett v. Cumberland College*, 316 F.3d 571, 584 (6th Cir. 2003) (citing *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)).  However, such "eyewitness allegations" must be "'*reasonably trustworthy*.'"  *Wesley*, 779 F.3d at 429 (quoting *Logsdon v. Hains*, 492 F.3d 334, 342 (6th Cir. 2007)) (emphasis in original).  Wieber was present at both the July 24 and August 1 incidents.  On July 24, Wieber arrested an African-

American male who drove a black Mercedes sedan for misdemeanor unlawful entry at the home. Wieber had no knowledge of whether this individual was ever prosecuted and charged.  (Wieber Dep. 17-18.)  Days later, dispatch received a call reporting that the "same young black man" driving his black sedan had returned to the home.  (8/1/2021 Dispatch Call 00:18-00:22.)  Before arriving on the scene, Wieber personally contacted the caller to confirm that it was the same suspect from the July 24 incident. (Wieber Dep. 27-28.)  Here, there was "no apparent reason to question the person's reliability," meaning there was no "apparent reason for [Wieber] to believe that the eyewitness was lying, did not accurately describe what [she] had seen, or was in some fashion mistaken regarding [her] recollection."  *Wesley*, 779 F.3d at 430 (internal citations and quotation marks omitted).

Probable cause in this case stems not only from a reasonably trustworthy eyewitness but also from the corroboration of the eyewitness's assertions by the individual officers on the scene. *See Gerics v. Trevino*, 974 F.3d 798, 807 n.8 (6th Cir. 2020).  Wieber approached the scene and parked his patrol car behind the two sedans.  Wieber noticed that "the vehicle in front of the one that [he] was parked behind, had a similar body style to the one from July 24." (Wieber Dep. 31.) Wieber did not check the make, model, and license plate information of that car.  (*Id.* at 32.)  Once Quintard informed Wieber that he had seen movement from inside the home, Wieber stepped out of his vehicle and used his driver's side door and the interior of his patrol car as cover before instructing Plaintiffs to come out of the house so that he could detain them.  (*Id.* at 33.)  Wieber chose to "secure the scene" prior to investigating further "for officer safety."  (*Id.* at 45.)

The fact that Wieber did not recognize Plaintiffs once they exited the home weakens but does not defeat the existence of probable cause.  "[A]n officer 'is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light

of . . . the information possessed at the time by the arresting agent.'" *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)).  Here, Wieber did not identify Brown, Thorne or S.T. as the suspect from the July 24 incident.  This alone does not change the fact that the Sharon Avenue home could have been broken into and unlawfully entered by other individuals.  As Wieber testified, "it was the same point of entry, a similar vehicle which ended up not being the same vehicle, so until we could verify everything, it was still treated as [a breaking and entering]."  (Wieber Dep. 48.)  Upon verification of Brown's identity, all three Plaintiffs were immediately released.   "'[E]ven if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful.'"  *Barton*, 949 F.3d at 950 (quoting *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011)).  Based on the history of the Sharon Avenue home and Plaintiffs' presence inside it, Wieber had probable cause even after he did not identify Brown, Thorne, or S.T. as the suspect from the July 24 incident.

<u>Officers Kamstra, Quintard, Kotarak, and Jackson</u>

Kamstra, Quintard, Kotarak, and Jackson likewise had probable cause.  Once Wieber escalated the initial call from a trespass to a breaking and entering, Kamstra, Quintard, Kotarak, and Jackson responded to the Sharon Avenue home.  (*See* Look Dep. 16 (explaining that because the severity of the call increased, so did the number of officers responding to the call).)  Their response was predicated on the information obtained from dispatch and from Wieber.  None of these officers were themselves present at the July 24 incident, and they were not required to verify the reliability of the information provided to them.

"[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers,

who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."

*United States v. Hensley*, 469 U.S. 221, 231 (1985) (quoting *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976)); *see also Humphrey v. Mabry*, 482 F.3d 840, 848-49 (6th Cir. 2007) (quoting *Hensley*).  The officers arrived on the scene of a suspected breaking and entering at an unoccupied home that had previously been unlawfully entered, observed movement inside the home, and heard an individual yell "Officers!" from the home then duck under the window before coming out the front door.  The facts and reasonably trustworthy information available to Kamstra, Quintard, Kotarak, and Jackson at the time were "sufficient to warrant a prudent man in believing that [Plaintiffs] had committed or [were] committing an offense."  *Wesley*, 779 F.3d at 429.

Officer Look

Look cannot be liable for the alleged unlawful detention of Plaintiffs.  "[A] defendant may not be 'held liable for the conduct of another' under § 1983."  *Alexander*, 733 F. App'x at 267 (citing *Apsey v. Chester Twp.*, 608 F. App'x 335, 339 (6th Cir. 2015)).  In order to succeed on a false arrest claim against Look, Plaintiffs must show that he *personally* committed the alleged violation.  *Id.*  "A person is arrested when an officer by means of physical force or show of authority, terminates or restrains her freedom of movement."  *Id.* (internal citations and quotation marks omitted).  Here, Look arrived on the scene after Plaintiffs were already detained.  "Absent a showing of direct responsibility, 'an officer's "mere presence" at the scene of an arrest fails to establish § 1983 liability.'"  *Haywood v. Hough*, 811 F. App'x 952, 960 (6th Cir. 2020) (quoting *Alexander*, 733 F. App'x at 267).

### (b) Excessive Force

"A seizure is 'unreasonable' under the Fourth Amendment if officers used excessive force."  *Puskas v. Del. Cnty.*, 56 F.4th 1088, 1093 (6th Cir. 2023) (quoting *Gambrel v. Knox Cnty.*,

25 F.4th 391, 400 (6th Cir. 2022)).  "In deciding whether the force used was excessive, [the Court] balance[s] the government's interests in protecting others (including the police) and curbing crime against a suspect's right [] not to be injured."  *Id.* (citing *Gambrel*, 25 F.4th at 400).

> Three factors are particularly relevant: (1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether he [wa]s actively resisting arrest or attempting to evade arrest by flight.

*Id.* (internal citations and quotation marks omitted).  "These factors are not an exhaustive list because the ultimate question is whether the totality of the circumstances justifies [the] particular sort of seizure that took place."  *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022) (internal citations omitted).  "An officer's use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' given the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).  Plaintiffs argue that officers used excessive force by handcuffing them, pointing guns in their direction, and failing to intervene to protect them.

Handcuffing

There is a more specific three-part test for determining whether "'unduly tight or excessively forceful handcuffing' constitutes excessive force."  *Hughey v. Easlik*, 3 F.4th 283, 289 (6th Cir. 2021) (quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).  To survive summary judgment, a plaintiff must show a genuine dispute of material fact that: "(1) [they] complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing."  *Id.* (quoting *Morrison*, 583 F.3d at 401).

Plaintiffs have not satisfied this test.  Wieber, Kamstra, and Jackson handcuffed Plaintiffs. Only Thorne appears to have complained of the handcuffs being too tight.  (*See* Jackson Body Camera 4:07-4:19; Thorne Dep. 68.)  Brown, on the other hand, testified that he is not claiming the handcuffing was excessively forceful or tight.  (*See* Brown Dep. 102.)  Moreover, Plaintiffs have not demonstrated that Thorne, Brown, or S.T. experienced physical injury as a result of the handcuffing.  Thus, Wieber, Kamstra, and Jackson did not use excessive force when handcuffing Plaintiffs.

Pointing Guns

"[P]ointing a firearm at an individual . . . is more than merely displaying a firearm with an intent to intimidate (i.e., brandishing) because by pointing a firearm at an individual and making a demand of that individual, a defendant communicates the implicit threat that if the individual does not comply with the defendant's demands, the defendant will shoot the individual."  *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007).  Accordingly, the Sixth Circuit has held that pointing a gun at an individual under certain circumstances can constitute excessive force in violation of the Fourth Amendment.  *See, e.g.*, *Binay v. Bettendorf*, 601 F.3d 640, 649-650 (6th Cir. 2010) (finding that pointing a gun at an individual who "had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee" constituted excessive force); *Vanderhoef v. Dixon*, 938 F.3d 271, 277-78 (6th Cir. 2019) (finding that ordering "three unarmed and nonthreatening teens exit[ing] [a] damaged vehicle" to the ground at gunpoint violated their constitutional rights); *Wright v. City of Euclid*, 962 F.3d 852, 866 (6th Cir. 2020) (finding a genuine dispute of material fact when officers conducted a traffic stop with their weapons drawn without identifying the plaintiff as a drug dealer or corroborating their suspicions of criminal activity).

17

Here, four officers had their guns drawn or brandished throughout the encounter.  While taking cover behind the door of his patrol car, Wieber had his gun drawn and pointed down at his side.  (Wieber Dep. 36.)  Wieber did not point his gun towards the home or Plaintiffs.  (*Id.* at 42.)  Quintard ran to the southeast corner of the property with his gun pointed towards the window where had had seen movement.  (Quintard Dep. 26-28.)  At one point, he also had his gun pointed at a patio door near the rear of the home.  (Quintard Body Camera 3:18-3:59.)  While establishing a perimeter with Quintard, Kotarak drew his weapon but testified that he never pointed it directly at the home.  (Kotarak Dep. 32.)  Thorne testified that the "one by the tree," meaning Kotarak, had his gun "pointed towards the ground [at] first" but then pointed it towards the window after Thorne yelled "Officers!"  (Thorne Dep. 38-41.)  Jackson had his gun pointed at the front door after Plaintiffs were instructed to exit the home.  (Jackson Dep. 23.)  He maintained this position as Plaintiffs walked out of the home with their arms raised.  (*Id.* at 37-38.)  Plaintiffs argue that *Binay* and *Vanderhoef* support a finding of a constitutional violation under these circumstances.

In *Binay*, the defendant police officers entered the plaintiffs' home wearing face masks, pointed their guns at the plaintiffs, and forced them to the floor where they were handcuffed.  The officers continued to hold plaintiffs at gunpoint even after a drug sniffing dog found no scent or presence of narcotics in the apartment.  The encounter lasted approximately an hour.  The Sixth Circuit found that "questions remain as to whether [the officers] continued to detain [the plaintiffs] at gunpoint long after the risk of flight and risk to the officers subsided, particularly in light of the rationale behind the limited authority to detain the occupants of a premises during a proper search—to prevent flight and minimize the risk to the officers."  *Binay*, 601 F.3d at 650 (citing *Hill v. McIntyre*, 884 F.2d 271, 277 (6th Cir. 1989)).  The Court also emphasized that the officers'

wearing of masks during the entry and search could "add[] to an environment of intimidation and terror such that it contributed to a use of excessive force." *Id.*

In *Vanderhoef*, the defendant police officer was off duty and driving home in his personal vehicle. The plaintiff lost control of his vehicle while driving too fast, swerved past the oncoming-traffic lane and into a ditch on the side of the before swerving back across the road and hitting the officer's car. The officer "approached [the plaintiff's] car reasonably suspecting that the driver had driven recklessly," "saw three unarmed and nonthreatening teens exit the damaged vehicle," and "ordered them all to the ground at gunpoint without any of the three teens actively—or even passively—resisting authority and commands." *Vanderhoef*, 938 F.3d at 278. The Sixth Circuit found that the officer's conduct amounted to excessive force. *Id.*

Both cases are factually distinguishable from this case. First, unlike the officers in *Binay and Vanderhoef*, Defendants presented themselves to Plaintiffs as officers—they arrived in patrol cars and wore their uniforms. Moreover, Plaintiffs posed an unknown threat to the officers. In *Binay*, the plaintiffs were laying on the ground handcuffed during a search. In *Vanderhoef*, the plaintiffs were attempting to exit a damaged vehicle after a serious car accident. Here, Wieber, Quintard, Kotarak and Jackson arrived on the scene of a suspected breaking and entering with no knowledge as to whether anyone in the home had a weapon or posed a threat to their safety as well as the safety of others. Lastly, as soon as Plaintiffs were detained in handcuffs, guns were no longer pointed at them. Wieber re-holstered his gun to handcuff Thorne and then drew it to his side again as Thorne sat in the patrol car. (Wieber Dep. 44.) Jackson re-holstered his gun to handcuff S.T. (Jackson Dep. 38.) Kotarak re-holstered his gun once Plaintiffs "were following officer commands and ultimately detained." (Kotarak Dep. 44.) Similarly, once Quintard heard Look apologizing to Plaintiffs for the misunderstanding, he did not raise his gun above chest-level

19

again.  (Quintard Body Camera 6:57-7:28; Quintard Dep. 37-38.)  Plaintiffs were only detained at gunpoint until the risk to the officers' safety was neutralized and the handcuffs were secured.  The amount of force used by the officers in *Binay* and *Vanderhoef* exceeded that used by Wieber, Quintard, Kotarak, and Jackson.  Therefore, Defendants did not use excessive force when pointing their guns.

Failure to Protect

"'Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'"  *Bard v. Brown Cnty.*, 970 F.3d 738, 752-53 (6th Cir. 2020) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  Here, Look was the only officer that did not actively participate in any allegedly excessive uses of force.  However, Look arrived on the scene when Plaintiffs had already been brought out of the house and were detained.  (Look Dep. 9.)  He neither observed the uses of force nor had the opportunity to prevent them from occurring.  Consequently, Look cannot be liable for failing to intervene and stop the allegedly excessive uses of force.

### (c) Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws[,]" which is essentially a direction that all persons similarly situated should be treated alike.  U.S. Const. amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  The threshold element of an equal protection claim is disparate treatment.  *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the

government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'") (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 299 (6th Cir. 2006)). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637,651 (6th Cir. 2011)); *see also Tree of Life Christian Schs. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'") (quoting *Paterek*, 801 F.3d at 650).

Plaintiffs have not identified any similarly situated individual of another race who was treated differently by the individual Defendants. Plaintiffs' amended complaint alleges that the "Defendant Officers detained the plaintiffs at gunpoint and in handcuffs only because they are African American. Defendant Officers would not have detained the plaintiffs at gunpoint, nor would the defendant officers have handcuffed the plaintiffs, had the plaintiffs been Caucasian." (Am. Compl. ¶¶ 55-56, ECF No. 24.) Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

At summary judgment, Plaintiffs argue that the individual Defendants "have the burden of showing that there are no genuine issues of material fact relating to a particular claim. [Their summary judgment motion] was their opportunity to explain what, *other than Plaintiffs' race*, indicated that these particular individuals were engaged in criminal conduct. They have provided the Court with nothing." (Pls.' Br. in Opp'n to Individual Defs.' Mot. for Summ. J., PageID.1199.) To the contrary, the individual officers have explained the facts and circumstances that led to

Plaintiffs' detention, including the July 24 incident, the August 1 dispatch call, Wieber's conversation with the August 1 caller, the similarity of the vehicles involved in both incidents, and the observation of movement within the home.  In response, Plaintiffs have not created a genuine dispute of material fact.  They have not pointed to any similarly situated individual of another race that was treated differently.

In sum, even if Plaintiffs met their burden of showing their rights were clearly established, they fail to show that the individual Defendants violated their constitutional rights.  Wieber, Kamstra, Quintard, Kotarak, Jackson, and Look are entitled to qualified immunity.

### B. Supervisory Liability

Plaintiffs bring a claim of supervisory liability against Koster.  As an initial matter, Koster has moved for both dismissal and summary judgment on the supervisory liability claim against her.  Plaintiffs incorrectly allege that Defendants have not moved for summary judgment on behalf of Koster in either motion.  (*See* Pls.' Br. in Opp'n to Def. City of Wyoming's Mot. for Summ. J., ECF No. 45, PageID.811.)  However, Koster did move for summary judgment.  (*See* Individual Defs.' Mot. for Summ. J., ECF No. 41, PageID.701.)  Plaintiffs did not address Koster's argument in their response to this motion.  Accordingly, Koster is entitled to summary judgment because Plaintiffs have failed to demonstrate a genuine dispute of material fact.  However, Plaintiffs did address supervisory liability in their response to Defendants' motion to dismiss.  Accordingly, the Court will proceed to also analyze the merits of the claim under a 12(c) standard.

Supervisory liability is premised on two requirements: active involvement by the supervisor and causation.  First,"'[t]o succeed on a supervisory liability claim, [a plaintiff] must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'"  *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) (quoting *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020)).  This

"requires some 'active unconstitutional behavior' on the part of the supervisor.'" *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)).  "[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Id.* (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)).

Plaintiffs argue that Koster authorized unconstitutional conduct by failing to train and supervise the officers on the use of excessive force, unconstitutional detention, and discrimination on the basis of race.  (*See* Pls.' Br. in Opp'n to Defs.' Mot to Dismiss, ECF No. 29, PageID.231.) Plaintiffs rely on *Peatross* to argue that Koster "'at a minimum, knowingly acquiesced' in the unconstitutional conduct of [her] subordinates through the execution of [her] job functions." *Peatross*, 818 F.3d at 244 (quoting *Coley v. Lucas Cnty.*, 799 F.3d 530, 542 (6th Cir. 2015)). However, the plaintiff's complaint in *Peatross* went "a step further" and alleged that from 2009 to 2013, there had been fifty-four officer shootings and eighteen people had been shot and/or killed at the hands of the Memphis Police Department in a single year.  *Id.* at 243.  In 2012, the Director of the Memphis Police Department—who the plaintiff claimed was liable under a theory of supervisory liability—"acknowledged a dire need to review and improve the police department's operations[,] and noted that the [Memphis Police Department] needed to improve its disciplinary process.  However, no improvements were made.  Moreover, in September 2012, the mayor publicly admonished [the Director] and described the [Memphis Police Department] as unacceptable[.]" *Id.*  Plaintiffs have not alleged a similar factual basis upon which the Court can find that Koster gave her officers "the green light to violate the civil rights of citizens" before this incident transpired.  *Id.* (internal quotation marks omitted).  Plaintiffs' amended complaint is devoid of factual allegations related to Koster's job functions and her performance of them.

Second, there must be a causal connection in the form of both actual and proximate cause "between the defendant's 'active unconstitutional behavior' and the plaintiff's injuries." *Crawford*, 15 F.4th at 762 (quoting *Peatross*, 818 F.3d at 242). Actual causation is "'typically assessed using the but for test, which requires us to imagine whether the harm would have occurred if the defendant had behaved other than he did.'" *Id.* (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007)). Proximate cause, on the other hand, requires a "sufficient link between defendant's conduct and the plaintiff's injuries" such that "the supervisor's active unconstitutional conduct could be reasonably expected to give rise to just the sort of injuries that occurred." *Id.* (internal citations and quotation marks omitted). Plaintiffs fail to make a showing on either actual or proximate causation. Importantly, there is no link between Plaintiffs' injuries and Koster's conduct. "Supervisory liability is generally limited to times when the supervisor had existing knowledge of the specific type of conduct that led to a plaintiff's injuries." *Id.* at 767 (citing *Garza*, 972 F.3d at 859-65 (teacher's physical abuse); *Peatross*, 818 F.3d at 237-39 (police department's shootings); *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012) (K-9 unit's dog bites)). Plaintiff's amended complaint does not describe any past incidents of excessive force, unconstitutional detention, or discrimination on the basis of race. Koster's *post hoc* review of this incident for compliance with the City's policies and practices cannot establish a causal link to Plaintiffs injuries. In sum, Plaintiffs' amended complaint fails to state a claim of supervisory liability against Koster.

### C. Municipal Liability

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities could be liable under § 1983 for constitutional violations, but they "cannot be liable for the constitutional torts of [their] employees." *Powers*, 501 F.3d at 607. In other words, "[a] municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other

24

words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89

(6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691) (emphasis in original)).

To succeed on a *Monell* claim against a municipality, Plaintiffs must demonstrate that the

alleged federal violation occurred because of a municipal policy or custom. *Burgess v. Fischer*,

735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 694). And they must establish that

the policy or custom was the "'moving force' behind the deprivation of the plaintiff's rights."

*Powers*, 501 F.3d at 607 (quoting *Monell*, 436 U.S. at 691). There are four ways Plaintiffs can

show an illegal policy or custom: "(1) the existence of an illegal official policy or legislative

enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the

existence of a policy of inadequate training or supervision; or (4) the existence of a custom of

tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478 (citing *Thomas

v. City of* Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)). Plaintiffs' claim appears to rely the

first three theories.

### 1. Official Policy

Plaintiffs reference this theory in their amended complaint and brief in opposition to

Defendants' motion to dismiss. (*See* Am. Compl. ¶¶ 46-49; Pls.' Br. in Opp'n to Defs.' Mot. to

Dismiss, ECF No. 29, PageID.228.) However, Plaintiffs' brief in opposition to the City's motion

for summary judgment does not address this theory of municipal liability. (*See* Pls.' Br. in Opp'n

to Def. City of Wyoming's Mot. for Summ. J., PageID.804-811.) Because Plaintiffs have not

actually pointed to an illegal official policy of the City, their claim must fail under this theory. *See

Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) ("[A] plaintiff must 'identify the

policy, connect the policy to the city itself and show that the particular injury was incurred because

of the execution of that policy.'" (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir.

1987))).

25

## 2. Ratification

"A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020) (citing *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247-48 (6th Cir. 1990)).  Plaintiffs argue that the City ratified the individual officers' conduct by reviewing the incident and determining that they responded appropriately.  Plaintiffs note that the City "did not discipline a single officer involved in these events" and, instead, "chose to Defend its officers and put forth a highly misleading press release drawing improper and non-existent connections between these events and the event of one week prior."  (Pls.' Br. in Opp'n to Def. City of Wyoming's Mot. for Summ. J., PageID.809; *see also* Press Release, ECF No. 45-14, PageID.1109 ("After a thorough internal review of the actions of each of our public safety officers who responded to this incident, we have concluded race played no role in our officers' treatment of the individuals who were briefly detained, and our officers responded appropriately.").)

The Sixth Circuit has held that "an allegation of a *single* failure to investigate a single plaintiff's claim does not suffice." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020) (citing *Burgess*, 735 F.3d at 478-79; *Thomas*, 398 F.3d at 433-34) (emphasis in original).  "As a result, 'a claim based on inadequate investigation' requires 'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Id.* (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017)); *see also Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019) ("[T]here must be multiple earlier inadequate investigations and they must concern comparable claims.").  This requirement that there be multiple failures to investigate is further supported by *Monell*'s rigorous causation requirement.  "[A]n entity's failure to investigate the plaintiff's specific claim will, by definition,

come *after* the employee's action that caused the injury about which the plaintiff complains. Because the injury will have already occurred by the time of the specific investigation, 'there can be no causation' from that single failure to investigate." *Id.* (quoting *David*, 706 F. App'x at 853) (emphasis in original).  Here, Plaintiffs rely exclusively on the City's response to this incident. Plaintiffs have made no attempt to show additional instances of inadequate investigations in comparable situations.

The Sixth Circuit has also recognized a "single-act theory" of ratification.  *See, e.g.*, *Burgess*, 735 F.3d at 479; *Wallace v. Coffee Cnty.*, 852 F. App'x 871, 878 (6th Cir. 2021). "However, [to succeed] on a single-act theory, a plaintiff must demonstrate that a 'deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question.'" *Burgess*, 735 F.3d at 479 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  "Moreover, that course of action must be shown to be the moving force behind or cause plaintiff's harm." *Id.* (citing *Pembaur*, 475 U.S. at 484-85).  Koster, the Chief of Police, is named as a Defendant in this case.  Plaintiffs have not shown that Koster ordered or even participated in the incident at issue. An official's "after-the-fact approval of the investigation, which did not itself cause or continue a harm against [Plaintiffs], [is] insufficient to establish the *Monell* claim."  *Id.* at 479 (citing *Pembaur*, 475 U.S. at 481-84; *Moldowan v. City of Warren*, 578 F.3d 351, 394 & n.20 (6th Cir. 2009)).

### 3. Failure to Train

"Inadequate training can be the basis for a *Monell* claim, but '[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'" *Morgan by Next Friend Morgan v. Wayne Cnty.*, 33 F.4th 320, 329 (6th Cir. 2022) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  "[T]o show that a municipality is liable for a failure to train

27

its employees, a plaintiff 'must establish that: (1) the City's training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).

Plaintiffs argue that the City failed to adequately train its officers on the proper standards to detain individuals at gunpoint. However, the evidence demonstrates that the City did provide the individual Defendants with relevant training. In 2021, Wieber, Kamstra, Quintard, Kotarak, Jackson, and Look all attended training sessions on cultural competency, biased based policing, the use of force, and de-escalation tactics. (*See* Training Summaries, ECF No. 40-19.) Plaintiffs provide no details regarding the City's existing training programs such as their length, topics of instruction, and frequency. They have not shown how these programs are inadequate. In *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020), the Sixth Circuit reversed a district court's grant of summary judgment on a failure to train claim where there was evidence that the city's training regimen consisted of "simply reading the use-of-force policy to the officers at rollcall until it is believed that all the officers have heard it" and "followed up with a one-or-two page quiz that may or may not be given to officers." *Id.* at 881 (internal citation omitted). Here, Plaintiffs have not provided any similar level of detail regarding the sufficiency of the City's training.

Even assuming that Plaintiffs could show that the City's training was inadequate, they have provided no evidence to demonstrate that this inadequacy is a product of the City's deliberate indifference. "'[D]eliberate indifference is a stringent standard of fault.'" *Jackson*, 925 F.3d at 834 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). Deliberate indifference can be shown by "(1) 'prior instances of unconstitutional conduct demonstrating that the City had

notice that the training was deficient and likely to cause injury but ignored it' or (2) 'evidence of

a single violation of federal rights, accompanied by a showing that the City had failed to train its

employees to handle recurring situations presenting an obvious potential for such a violation.'"

*Id.* at 836 (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012)).  The

Supreme Court explained the single-violation theory in *City of Canton v. Harris*, 489 U.S. 378

(1989).  The Court noted that "it may happen that in light of the duties assigned to specific officers

or employees the need for more or different training is so obvious, and the inadequacy so likely to

result in the violation of constitutional rights, that the policymakers of the city can reasonably be

said to have been deliberately indifferent to the need."  *Id.* at 390.

> Plaintiffs rely on the single-violation theory and argue that

> the obvious unconstitutionality of the individual Defendants permits a reasonable
> finder of fact to conclude that one of two things must be true: the Defendants were
> never trained on constitutional principles or, if they were, were never made to feel
> as if that training was important.  That reasonable inference allows for a finding of
> municipal liability pursuant to Canton v. Harris.

(Pls.' Br. in Opp'n to Def. City of Wyoming's Mot. for Summ. J., PageID.810-811.)  As previously

mentioned, the City did provide the individual Defendants with relevant training.  Plaintiffs neither

identify what other training they believe the individual Defendants should have received nor do

they explain how the existing training put the City on notice of the likelihood for violations of

constitutional rights.  *See Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018) ("But [the

plaintiff] does not identify what other medical training she believes that the jail personnel should

have received.  Nor does she explain how the quality of the medical training provided put the

County on notice of the likelihood that jail personnel would respond inadequately to an inmate's

medical emergency.").   Accordingly, the Court finds Plaintiffs' argument conclusory and

unpersuasive.  Plaintiffs have "failed to demonstrate that [the City] failed to train its employees

'to handle a recurring situation presenting an obvious potential for [the constitutional violation at

issue.]'" *Griffith v. Franklin Cnty.*, 975 F.3d 554, 584 (6th Cir. 2020) (quoting *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).  In sum, the City is entitled to summary judgment on Plaintiffs' municipal liability claim.

### D. Official Liability

Plaintiffs are suing "[a]ll individually named defendants . . . in their individual *and* official capacities."  (Am. Compl. ¶ 16.)  "'An individual-capacity claim is distinct from a claim against a defendant in his official capacity.  The former claim may attach personal liability to the government official, whereas the latter may attach liability only to the governmental entity.'" *Direct Constr. Servs., LLC v. City of Detroit*, 820 F. App'x 417, 426 (6th Cir. 2020) (quoting *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 354 (6th Cir. 2013)).  The Sixth Circuit has found that "'an official-capacity claim is merely another name for a claim against the municipality,'" and is thus duplicative.  *Id.* (quoting *Essex*, 518 F. App'x at 354); *see also Pineda*, 977 F.3d at 494 (finding that a suit against a defendant sheriff in his official capacity "as analogous to a suit against the local entity" (citing *Kentucky v. Graham*, 473 U.S. 159, 166-67 n.14 (1985))).

Moreover, the Sixth Circuit has explicitly "approved the dismissal of official-capacity claims against individual defendants where the government entity is a party and the plaintiff fails to demonstrate that a policy or custom of the defendant government entity played a part in the violation." *Baar v. Jefferson Cnty. Bd. of Educ.*, 476 F. App'x 621 (6th Cir. 2012) (citing *Petty v. Cnty. of Franklin*, 478 F.3d, 341, 344, 348-50 (6th Cir. 2007)).  As previously discussed, Plaintiffs fail to demonstrate that a violation occurred because of a municipal policy or custom.  Dismissal of Plaintiffs' official capacity claims against Koster, Wieber, Kamstra, Quintard, Kotarak, Jackson, and Look is warranted.

### E. State Law Claims

The Court will dismiss Plaintiffs' federal claims.  Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1996))); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."  *Landefeld*, 994 F.2d at 1182; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." (internal quotation marks omitted)).  Dismissal, however, remains "purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).  Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction.  Accordingly, Plaintiffs' state-law claims are properly dismissed without prejudice.

### IV. CONCLUSION

For the reasons stated above, the Court will grant summary judgment to Defendants Wieber, Kamsta, Quintard, Kotarak, Jackson, and Look on Plaintiffs unlawful detention, excessive force, and equal protection claims, Counts I and III of Plaintiffs' amended complaint.  The Court will also grant summary judgment to the City on the claim of municipal liability and will dismiss

the claim of supervisory liability against Koster, Count II of Plaintiffs' amended complaint. Plaintiffs' official capacity claims against Koster, Wieber, Kamstra, Quintard, Kotarak, and Jackson will be dismissed as duplicative. Finally, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, Counts IV, V and VI of Plaintiffs' amended complaint. Accordingly, the Court will dismiss the state law claims without prejudice.

Dated: <u>February 28, 2023</u>               <u>/s/ Hala Y. Jarbou</u>
                                             HALA Y. JARBOU
                                             CHIEF UNITED STATES DISTRICT JUDGE